[Cite as *Fox v. Nationwide Mut. Ins. Co.*, 2018-Ohio-2830.]

## IN THE COURT OF APPEALS OF OHIO

## TENTH APPELLATE DISTRICT

|  |  |  |
|---|---|---|
| JamiLynn Fox, | : | |
| Plaintiff-Appellant, | : | |
| v. | : | No. 17AP-745 |
| | | (C.P.C. No. 15CV-4567) |
| Nationwide Mutual Insurance Company et al., | : | |
| | : | (REGULAR CALENDAR) |
| Defendants-Appellees. | : | |
| | : | |

## D E C I S I O N

### Rendered on July 17, 2018

**On brief:** *Caryn Groedel & Associates, Co., LPA, Matthew S. Grimsley*, and *Caryn M. Groedel*, for appellant. **Argued:** *Matthew S. Grimsley.*

**On brief:** *Isaac Wiles Burkholder & Teetor, LLC, J. Stephen Teetor*, and *Shawn K. Judge*, for appellee Nationwide Mutual Insurance Co. **Argued:** *J. Stephen Teetor.*

APPEAL from the Franklin County Court of Common Pleas

SADLER, J.

{¶ 1} Plaintiff-appellant, JamiLynn Fox, appeals from a judgment of the Franklin County Court of Common Pleas in favor of defendants-appellees, Nationwide Mutual Insurance Company ("Nationwide") and Shymal Sogal. For the reasons that follow, we affirm.

## I. FACTS AND PROCEDURAL HISTORY

{¶ 2} Immediately prior to the events that give rise to this case, Fox owned and operated two Allstate Insurance ("Allstate") offices in New York City. According to Fox, she owned the book of business that she had acquired at Allstate, which meant that she retained

servicing rights on the policies she sold and received a certain percentage of premiums paid to Allstate for those policies.

{¶ 3}   In spring 2011, Nationwide Sales Manager Sogal and Associate Vice President Kim Ward began recruiting Fox to purchase a Nationwide agency in Ohio.  In May 2011, Fox met with Sogal to discuss an agency opportunity with Nationwide.  Fox has maintained that she was only interested in an opportunity in the Columbus, Ohio area, but Sogal told Fox there were no such opportunities in Columbus.  Instead, Sogal informed Fox of a "unique opportunity" to purchase two existing Nationwide agencies in Sylvania, Ohio, which is in Northwest Ohio on the Michigan border.  (Fox Dep. at 45.)  According to Fox, Sogal told her that two Nationwide agents, Craig Riker and Carlo Gibellato, were scheduled to retire and that their respective books of business would be combined and available to purchase.  Sogal reportedly told Fox that the "Riker-Gibellato" book of business contained $4,000,000 in Direct Written Premium ("DPW"), that it would generate $500,000 in premium revenue annually, that Fox could expect to receive an additional $200,000 annually if she purchased the "Riker-Gibellato" book of business, and that future sales in the Michigan market were unlimited.

{¶ 4}   Fox claims Sogal failed to inform her that Nationwide intended to increase premiums for policy holders in the Michigan market, which would cause policy holder defections and decreased future sales opportunities.  Fox also claims Sogal failed to disclose that Nationwide had provided lucrative incentives to Sogal and to Ward for recruiting new agents and convincing those agents to purchase existing books of business.  Fox claims she was also unaware that her future compensation from Nationwide was variable, which meant her earnings depended largely on the number of new agents she could recruit to work for her and their relative success.

{¶ 5}   In July 2011, Nationwide Vice President Eric Smith interviewed Fox for a position in Nationwide's Replacement Agency Executive ("RAE") program.  According to Fox, Smith told her that Nationwide had significantly decreased its rates in the Midwest region and that she would be able to reap the benefit of increased sales in the Michigan market as a "border agent" in the RAE program.  (Fox Dep. at 53, 56.)  Fox alleges that Smith did not tell her about the planned rate increase and did not tell Fox that Nationwide

planned to cancel many of the policies currently in the Riker-Gibellato book of business after she purchased it from Nationwide.

{¶ 6} Fox accepted the position with Nationwide and agreed to sell her two Allstate offices. Fox testified she "did quite well in the sale" of her Allstate agency. (Fox Dep. at 223.) Fox subsequently worked with Sogal to develop a pro forma financial statement and business plan for her proposed Nationwide agency. On October 6, 2011, Fox executed the Nationwide RAE program agreement ("RAE agreement"). The pro forma statement and business plan developed by Fox and Sogal were attached to the RAE agreement and made a part thereof.

{¶ 7} According to Fox, she relied on Sogal's representations regarding the substance of the RAE agreement, as well as her experience in the insurance industry and with Allstate. Fox admits she did not read the RAE agreement before she signed it. Pursuant to paragraph 13 of the RAE agreement, Fox received a $15,000 signing bonus.

{¶ 8} Paragraph 47 of the RAE agreement states "Nationwide extends to Agent the opportunity to service the designated Nationwide-owned policies that were previously serviced by the former agency of CRAIG A RIKER and CARLO M GIBELLATO (the 'Assigned Policies'). A list of the Assigned Policies is attached hereto as Exhibit I." (Emphasis sic.) (RAE agreement, Def.'s Ex. D, Fox Dep.) Pursuant to Exhibit B to the RAE agreement, the stated value of the Riker-Gibellato book is $3,860,594 in DWP, and in paragraph 48 of the RAE agreement, Fox is to pay $482,574 for the Riker-Gibellato book with an initial 10 percent down payment. The subsequent payment schedule called for monthly installments of $1,809.65, which were to be deducted from Fox's monthly commissions.

{¶ 9} The RAE agreement also contained provisions quantifying Fox's production requirements for the RAE program and her commission/bonus schedule. The RAE agreement defines Fox's Administrative Minimum Production Plan ("MPP") as Property and Casualty Direct Written Premium ("P&C DWP") and Life Sales "which Agent must satisfy on a monthly and cumulative basis as set forth in Exhibit B." (RAE Agreement at ¶ 7.) The term of the RAE agreement was 36 months. On successful completion of the RAE agreement, Fox had the option to enter into Nationwide's "RAE Independent Contractor Agent's Agreement and/or the RAE Corporate/LLC Agency Agreement available for

execution by Agent at that time (hereinafter collectively the 'RAE Career IC Agreement') [or] cancel [her] relationship with Nationwide." (RAE Agreement at ¶ 8.)

{¶ 10} Paragraph 8 of the RAE agreement further provides:

> All requirements of the [MPP] must be met on a monthly basis throughout the term of this Agreement, including the P&C DWP and Life Sales components. The total cumulative life sales required and P&C DWP, as outlined in Exhibit B, will be measured monthly. Nationwide shall, in its sole discretion, measure the achievement of Agent. The monthly P&C DWP and Life Sales data shall be measured pursuant to Revenue Connection, or such other database developed by Nationwide in its sole discretion for use in making such determination.

{¶ 11} Paragraph 8 also sets forth the consequences of failing to meet MPP as follows:

> Agent further agrees and understands that failure to meet the requirements of the [MPP] will result in cancellation of this Agreement. Agent understands that Nationwide has established reports, policies and procedures to address Agent's failure to meet [MPP] requirements and that these reports, policies, and procedures may change from time to time.

{¶ 12} In November 2011, Fox opened her Nationwide agency in Sylvania, Ohio in the office formerly run by Gibellato. Fox operated her agency as a limited liability company known as the J. Fox Agency, LLC ("J. Fox Agency"). Fox hired her daughter Jennifer to work at the agency and she retained one of Gibellato's employees, Karen Benner. Within a relatively short period of time, however, Fox began struggling to meet her MPP requirements.

{¶ 13} At some point in 2012, Fox recognized that her agency was nearing a production shortfall, which meant she was not meeting her MPP as set forth in Exhibit B to the RAE agreement. In spring 2013, Fox met with Smith and Ward. According to Fox, it was at that meeting she first became aware Nationwide could cancel the RAE agreement if she did not meet her MPP.

{¶ 14} In September 2013, Fox sent an email correspondence to her sales manager, Manny Mansour, detailing a number of family medical issues and events she was currently experiencing and asking for some relief from her MPP. Fox testified she believed

Nationwide's production requirements were "too steep," and she wanted Nationwide to relax the requirements. (Compl. at ¶ 23; Fox Dep. at 186.) As a result of Fox's email correspondence, Nationwide agreed to suspend Fox's MPP for three months. On December 23, 2013, Fox executed an amendment to the RAE agreement. The amendment memorialized Nationwide's agreement to suspend Fox's MPP for a three-month period beginning August 1 and ending October 31, 2013. The amendment also contained the following language just above the signature lines:

> By signing this amendment, Agent hereby reaffirms his/her promises, covenants, and obligations as set forth in the Agreement, *and waives all claims that he/she has or may have against Nationwide as of the date of his/her execution of this Amendment.*

(Emphasis added.) (Def.'s Ex. L at 2, Fox Dep.)

{¶ 15} Following the suspension of Fox's MPP in 2013, she continued to struggle to meet her MPP. One of Fox's issues with regard to the MPP requirements was the poor retention rate for policies in the Riker-Gibellato book of business. On June 23, 2014, Mansour contacted Fox by email to inform her he would be stopping by her office the next day with another amended RAE agreement to review and complete, a copy of which was attached to the email. Fox claims that Mansour threatened to cancel the RAE agreement if she did not sign the amendment. Fox testified that she contacted legal counsel regarding the amended RAE agreement and that she subsequently refused to sign the amendment on advice of counsel. On August 29, 2014, Fox submitted a "30-day resignation notice per section 32 of [her] contract." (Mincy Aff. at Ex. A, attached to Mar. 3, 2016 Joint Mot. for Summ. Jgmt.)

{¶ 16} On May 28, 2015, Fox commenced an action against Nationwide and Sogal alleging breach of contract, fraudulent inducement, intentional misrepresentation, unjust enrichment, false light invasion of privacy, invasion of privacy-misappropriating Fox's name, interference with business relationships, and gender discrimination-sexual stereotyping. Fox sought injunctive relief relative to the invasion of privacy claims and damages.

{¶ 17} On August 30, 2016, Nationwide filed a motion for partial summary judgment arguing the only reasonable inference to be drawn from the evidence is that Fox

worked for Nationwide as an independent contractor, not an employee.  On that same date, Fox, with leave of court, filed a cross-motion for summary judgment arguing the evidence established that she worked for Nationwide as an employee.  The parties agree that Fox's status as an employee of Nationwide is an essential element of her discrimination claim.

{¶ 18} The trial court ruled on the cross-motions for summary judgment on October 27, 2016.  The trial court concluded as follows:

> Upon review of all factors under the manner and means common law test, the court finds that reasonable minds could not differ in finding that Defendant Nationwide did not reserve the right to control over [Fox] on the manner and means of doing the work.  The court holds [Fox] was an independent contractor for Defendant Nationwide, not an employee. Therefore, the court GRANTS summary judgment for [Nationwide] on the matter of the independent contractor relationship.

(Emphasis sic.)  (Oct. 27, 2016 Decision at 12.)[1]

{¶ 19} Fox filed her second motion to compel discovery on December 13, 2016.  On January 25, 2017, Nationwide filed a motion for summary judgment as to Fox's remaining claims.  The trial court granted Fox's motion to compel, in part, and ordered Nationwide to provide identifying information to Fox regarding responsive documents previously provided in a redacted form.

{¶ 20} On August 4, 2017, the trial court issued a decision and judgment entry granting Nationwide's motion for summary judgment in part.  The trial court's entry reads, in relevant part, as follows:

> [T]he Court finds issues of material fact remain for [Fox's] Counts 1 (concerning §§25 and 30 of the RAE Agreement), 8, and 9.  No dispute of material fact exists for all other claims.  As such, the Court GRANTS IN PART [Nationwide's] motion for summary judgment on counts 1 (relating to §§8, 33, and 47 of the RAE Agreement), 3, 4, 6, 7, 10, and 12.

(Emphasis sic.)  (Aug. 4, 2017 Entry at 13.)

---

[1] On December 27, 2016, the trial court issued an "Order and Entry" dismissing Fox's gender discrimination claim "[b]ased on the Court's ruling on October 2[7], 2016 that Plaintiff Fox was an independent contractor, not an employee."

{¶ 21} Following the trial court's August 4, 2017 judgment, Fox's remaining claims included breach of contract corresponding to Nationwide's post-cancellation use of Fox's name on written materials and her likeness on certain advertising, as well as Fox's claims for invasion of privacy based on those same allegations.[2]

{¶ 22} On August 9, 2017, Fox filed both a motion for reconsideration of the trial court's August 4, 2017 judgment and a "motion for clarification" wherein Fox sought clarification whether the determination that issues of fact remained for trial as to certain aspects of her breach of contract claim also precluded summary judgment for Nationwide as to Fox's corresponding claim for breach of an implied covenant of good faith and fair dealing. On August 23, 2017, Nationwide filed a motion seeking reconsideration of that portion of the trial court's August 4, 2017 judgment holding that issue of fact existed regarding certain of Fox's claims. Nationwide argued the trial court overlooked certain evidence establishing the absence of factual issues for trial.

{¶ 23} On September 21, 2017, the trial court issued a decision granting Nationwide's motion for reconsideration and denying Fox's cross-motions for reconsideration and for clarification. The trial court determined, on reconsideration, that there were no genuine issues of material fact as to Fox's remaining claims and that Nationwide was entitled to judgment as a matter of law. The September 21, 2017 judgment entry disposed of all remaining claims in the case.

{¶ 24} Fox timely appealed to this court from the following judgments of the trial court: (1) October 27, 2016 decision and entry granting Nationwide's motion for partial summary judgment and denying Fox's motion for partial summary judgment; (2) February 6 and March 16, 2017 decisions denying, in part, Fox's motion to compel; (3) August 4, 2017 decision and entry granting, in part, Nationwide's motion for summary judgment; and (4) September 21, 2017 decision and entry granting Nationwide's motion for reconsideration.

## II. ASSIGNMENTS OF ERROR

{¶ 25} Appellant sets forth the following assignments of error:

---

[2] On May 25, 2017, Fox dismissed her claims against Sogal by filing a notice of voluntary dismissal pursuant to Civ.R. 41(A)(1)(a).

[1.] The trial court erred in deciding on summary judgment that Plaintiff-Appellant, JamiLynn Fox ("Fox") was an independent contractor for Defendant-Appellee, Nationwide Mutual Insurance Company ("NW"), when Fox offered abundance evidence that she was an employee.

[2.] The trial court erred in entering summary judgment in favor of NW on Count 1 (breach of the RAE Agreement).

[3.] The trial court erred by entering summary judgment in favor of NW on Count 2 (breach of the RAE Agreement's implied covenant of good faith and fair dealing).

[4.] The trial court erred by dismissing Counts 3, 4, and 7 (fraud-related claims) on the basis that Fox released these claims, because Fox was unaware of the fraud and damages arising therefrom at the time of the release.

[5.] The trial court erred by dismissing Counts 3, 4, and 7 (fraud-related claims) on the basis that Fox released these claims, because a genuine issue of material fact remains as to whether the release is unenforceable.

[6.] The trial court erred in entering summary judgment in favor of NW on Count 6 (unjust enrichment).

[7.] The trial court erred by, on reconsideration, entering summary judgment in NW's favor on Counts 8 (misappropriation of name and likeness) and 9 (false light).[3]

## III.  STANDARD OF REVIEW

{¶ 26} We review a summary judgment motion de novo.  *Leonard v. MBB Partnership*, 10th Dist. No. 15AP-956, 2016-Ohio-3534, ¶ 7, citing *Regions Bank v. Seimer*, 10th Dist. No. 13AP-542, 2014-Ohio-95, ¶ 9.  Pursuant to Civ.R. 56(C), summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact, if any, timely filed in the action, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."

---

[3] None of the assignments of error challenge the trial court's February 6 and March 16, 2017 decisions denying, in part, Fox's motion to compel.

{¶ 27} "[T]he moving party bears the initial responsibility of informing the trial court of the basis for the motion, and identifying those portions of the record before the trial court which demonstrate the absence of a genuine issue of fact on a material element of the nonmoving party's claim." *Dresher v. Burt*, 75 Ohio St.3d 280, 292 (1996). The burden then shifts to the defending party to set forth specific facts showing there is a genuine issue for trial. *Id.* If the defending party does not so respond, summary judgment, if appropriate, may be entered in favor of the party seeking affirmative relief. *Id.*

## IV. LEGAL ANALYSIS

### A. First Assignment of Error

{¶ 28} In appellant's first assignment of error, appellant argues the trial court erred when it determined, as a matter of law, that Nationwide employed appellant as an independent contractor and not as an employee. We disagree.

{¶ 29} In *Barcus v. Buehrer*, 10th Dist. No. 14AP-942, 2015-Ohio-3122, this court set forth the relevant test under Ohio law for determining whether a person is an employee or independent contractor:

> Whether a person is an employee or independent contractor depends on the facts of the particular case, with the key question being who had the right to control the manner and means of doing the work. [*Bostic v. Connor*, 37 Ohio St.3d 144,] 146 [(1988)]. If the employer reserves the right to control the manner and means of doing the work, as well as the result, then an employer-employee relationship is created. *State ex rel. Nese v. State Teachers Retirement Bd.*, 136 Ohio St.3d 103, 2013-Ohio-1777, ¶ 33, 991 N.E.2d 218. On the other hand, if the employer only specifies the result and the worker determines the manner and means of doing the job, then an independent contractor relationship is created. *Id.* In determining what kind of relationship exists, multiple factors must be considered, including who controls the details and quality of the work; who controls the hours worked; who selects the materials, tools, and personnel used; who selects the routes travelled; the length of employment; the type of business; the method of payment; and any pertinent agreements or contracts.

*Id.* at ¶ 7, citing *Bostic v. Connor*, 37 Ohio St.3d 144, 146 (1988).

{¶ 30} At the outset of our discussion, we note Fox's assertion that she was an employee of Nationwide and not an independent contractor arises primarily from her comparison of the conditions of employment with Nationwide to the conditions of her employment with Allstate. Based on Fox's representations regarding the terms of her relationship with Allstate, there is no question that Allstate exercised less control of the manner and means of Fox's work than did Nationwide. Nevertheless, this court will determine whether issues of fact exist as to the nature of Fox's relationship with Nationwide based on our analysis of the *Bostic* factors, not on a comparison to Fox's employment with Allstate.

{¶ 31} Turning to the *Bostic* factors, the pertinent agreement in this case is the RAE agreement. Paragraph 2 of the RAE agreement expressly states:

> The parties agree that the purpose of this Agreement will be best served by Agent acting as an independent contractor exclusive agent. Because Agent is an independent contractor exclusive agent and not an employee, *Agent is solely responsible for paying all federal, state, and local income and self-employment taxes as well as the timely and correct reporting and paying of all other taxes.* As an independent contractor exclusive agent, *Agent shall exercise independent judgment as to time, place, and manner of soliciting insurance, servicing policyholders, and otherwise carrying out the provisions of the Agreement consistent with Agent's obligation to provide the best possible service to Nationwide and its customers.* However, Agent understands that Nationwide has exclusive ownership, use and control of all policies and policy expirations and therefore has the right to service Nationwide customers at any time.

(Emphasis added.)

{¶ 32} Though Fox claims that Nationwide provided her with an inadequate opportunity to review the RAE agreement before she signed it and that she did not read the agreement prior to signing, the fact remains that the plain language used by the parties identifies Fox as "an independent contractor exclusive agent and not an employee." (RAE Agreement at ¶ 2.) There is no question that paragraph 2 of the RAE agreement evidences that the parties intended to create an independent contractor relationship.

{¶ 33} In addition to the conspicuous designation of Fox as "an independent contractor exclusive agent" in paragraph 2 of the RAE agreement, paragraph 3 of the RAE agreement provides the following with regard to "expenses":

> As an independent contractor exclusive agent, Agent is responsible for and will pay all expenses in connection with his/her Nationwide insurance agency, including, but not limited to, expenses for staff or employees, manuals, forms, and record supplies. Agent will not incur any indebtedness on behalf of Nationwide, nor will Nationwide be responsible for any expense incurred by Agent to comply with any term of this Agreement.

{¶ 34} In her deposition, Fox acknowledged that, with the exception of Nationwide's contributions to her advertising co-op expenses, she paid all of her own business expenses. Fox also selected and paid for her own office equipment and supplies. Fox argues, however, that Nationwide required Fox to purchase Nationwide's proprietary software programs pertaining to rate quotations and recordkeeping. She claims that such a requirement indicates Nationwide selects the material and tools she uses. Given the fact that the insurance industry is a highly regulated business in Ohio, we do not perceive Nationwide's mandate that the J. Fox Agency utilize Nationwide's standardized reporting and rate quotation software to be indicative of Nationwide's control of the manner and means by which Fox performed her work. Furthermore, as this court noted in *Barcus,* the type of business conducted by the parties is one of the *Bostic* factors that the court may consider in determining the nature of the parties' relationship.

{¶ 35} In this regard, we note in paragraph 4 of the RAE agreement, Fox agrees "[a]s an independent contractor" to be "responsible for securing and keeping in effect any licenses required by Nationwide or regulatory agencies * * * to * * * engage in the sale, solicitation or service of Nationwide policies, financial services or products." This provision evidences the parties' acknowledgment that important aspects of Fox's relationship with Nationwide are governed by certain regulatory authorities rather than Nationwide. There is no dispute in this case that Fox is required to obtain and keep in effect certain licenses issued by the Ohio Department of Insurance in order to sell Nationwide products and services.

{¶ 36} With regard to the personnel employed by the J. Fox Agency, we note that Benner, who was employed in Gibellato's Nationwide agency prior to being retained by Fox to work in the J. Fox Agency, submitted an affidavit in this matter.  Benner averred, in relevant part, as follows:

> 2. I was formerly an employee of the J. Fox Agency, LLC, located in Sylvania, Ohio.  I began working for the J. Fox Agency, LLC on approximately November 1, 2011.  When I left the J. Fox Agency, LLC, in approximately 2014, I did so on good terms. * * *
>
> * * *
>
> 4.  During my tenure with the J. Fox Agency, LLC, I was paid as a salaried employee and received a W2 from the J. Fox Agency, LLC annually.  All of my compensation was paid to me directly by the J. Fox Agency, LLC and I did not receive any compensation directly from Nationwide.
>
> 5.  During my employment with J. Fox Agency, LLC, Plaintiff Jami[L]ynn Fox controlled all aspects of the agency and made all business decisions associated with the agency, including on matters such as the hiring and firing of employees.

(Benner Aff. at 1-2, attached to Mar. 3, 2016 Joint Mot. for Summ. Jgmt.)

{¶ 37} Though some of the averments in Benner's affidavit are conclusory in nature, the only reasonable conclusion to be drawn from the facts in the affidavit and the other evidence submitted in this case is that Fox maintained control of hiring, payment, and supervision of all employees in her agency.  Fox acknowledged in her deposition that she chose the employees she wished to hire for the J. Fox Agency.  Fox argues, however, that Nationwide controlled her hiring practices pursuant to provisions in the RAE agreement that required her to submit potential employee information to Nationwide for background checks and mandated that new agency employees execute contracts drafted by Nationwide. We do not agree such evidence supports a finding that Nationwide exercised control over Fox's personnel given the undisputed evidence that Fox chose the employees she wished to hire, their job titles, the tasks they performed, and she measured their performance pursuant to her own standards.  Given the highly regulated nature of the insurance industry, the fact that Nationwide checked backgrounds of candidates and required new

employees of the J. Fox Agency to execute contracts with Nationwide evidences Nationwide's need to protect its business interests rather than control the means and manner of Fox's work.

{¶ 38} In a related argument, Fox maintains that provisions in the RAE agreement requiring her to report weekly to Nationwide on her activities related to the sale of Nationwide products and services, as well as the activities of her employees, demonstrate Nationwide's control of the means and manner of performing her work. Fox alleges that the weekly reporting requirement reflect Nationwide's control over the details of her work.

{¶ 39} Fox's deposition establishes, however, the weekly reports provided a quantitative basis for Nationwide to instruct Fox how much and what type of Nationwide product her agency needed to sell in order for her to meet her MPP. In other words, the purpose of the weekly reporting requirement was not to facilitate instruction from Nationwide on how to sell Nationwide products and whom to sell them to. Rather, when viewed in the proper context, the weekly reports were all about tracking the results of Fox's work against her MPP, and they had little to do with the means and methods employed by Fox or her employees in order to achieve those results. Importantly, there is no dispute that Fox was free to solicit sales from any available customers in her region.

{¶ 40} In our view, this case arises under similar circumstances to those addressed by the Sixth Circuit Court of Appeals in *Wolcott v. Nationwide Mut. Ins.*, 884 F.2d 245 (6th Cir.1989). In that case, a former commissioned agent sued Nationwide alleging breach of contract and seeking retirement benefits under a violation of the Employee Retirement Income Security Act ("ERISA"). The district court granted summary judgment for the agent. The Sixth Circuit affirmed the district court judgment for the agent on his breach of contract claim but reversed the district court on the ERISA claim. *Id.* at 251. The Sixth Circuit determined the agent was an independent contractor as a matter of law, not an employee of Nationwide entitled to ERISA's vesting protections. *Id.* In making its determination, the Sixth Circuit applied common-law rules of agency in determining

whether the agent was an employee for ERISA purposes.[4]  The *Wolcott* court reasoned as follows:

> The record shows that Wolcott hired his own employees and exercised managerial skill in the operation of his business. Further, Wolcott owned his own office condominium; maintained the office where the business was located; was responsible for most all of his own expenses; paid his own insurance; and was responsible for obtaining and maintaining a license to sell insurance. Further, he was paid on commission, and Nationwide made no deductions for Social Security or income taxes. In fact, Wolcott was responsible for reporting his own self-employed income to the Internal Revenue Service ("IRS"). He reported his commission income and business expenses to the IRS as self-employed income. Moreover, the Agent's Agreement stated that Wolcott was an independent contractor and not an employee. In addition, Wolcott was not eligible for regular employee benefits, including sick pay, vacation pay, and leave time, or any of the employee pension or retirement plans provided to Nationwide's regular employees. Finally, Wolcott admitted that he maintained his own Keough retirement plan. Given these undisputed facts, we conclude that Wolcott was not Nationwide's "employee" within the meaning of ERISA.

*Id.* at 251.

{¶ 41} Here, the undisputed evidence shows that Fox leased her own office in Sylvania, Ohio; maintained the office where the business was located; was responsible for most all of her own expenses; paid her own insurance; and was responsible for obtaining and maintaining a license to sell insurance. J. Fox Agency was paid by Nationwide on commission, and J. Fox Agency issued W-2 employee earnings statements to Fox and the other J. Fox Agency employees. Nationwide made no deductions for Social Security or

---

[4] The criteria to be considered include: "1) the degree of control and supervision over the manner in which the work is performed; 2) whether or not the 'employee' is engaged in his own business; 3) the company's right to hire and discharge the persons doing the work; 4) the method of compensation to the 'employee'; 5) whether the 'employee' receives the same benefits as the company's regular employees; 6) who has control of the premises where the work is done; 7) how the parties structure their Social Security and income relations; 8) whether the 'employee' stands to make a profit on the work of those working for him; 9) the amount of the 'employee's' investment in facilities and equipment; 10) the belief of the parties as to their business relationship; 11) the amount of skill required in the particular occupation; and 12) the duration of time for which the 'employee' is employed." (Additional citations omitted.) *Wolcott* at 251, citing *Holt v. Winpisinger*, 811 F.2d 1532, 1539-40 (D.C.Cir. 1987).

income taxes. Fox acknowledged that she was responsible for reporting J. Fox Agency's self-employed income to the Internal Revenue Service ("IRS"). The tax records in this case show that Fox reported J. Fox Agency's commission income, business expenses, and profits and losses to the IRS, and she paid taxes on her self-employed income. As previously noted, Fox is repeatedly referred to as an independent contractor throughout the RAE agreement. Considering the facts before us, similar to the facts in *Wolcott*, we conclude that Fox was an independent contractor of Nationwide as a matter of law.

{¶ 42} Fox counters the 36-month term of the RAE agreement permits an inference of an employer-employee relationship. We disagree. Under the particular circumstances of the parties' relationship, we find the duration of the RAE agreement has little impact on defining the parties' relationship in this case. Similarly, though Fox places emphasis on the fact Nationwide reportedly informed her that her office needed to remain open to the public during certain hours, we do not find that such a requirement permits the inference of control the hours she worked given the fact that insurance sales is essentially a retail business. Fox did not testify that Nationwide required her to personally man the Sylvania office during those business hours.

{¶ 43} Based on our de novo review of the relevant *Bostic* factors, we agree with the trial court that no reasonable trier of fact could find that Fox operated the J. Fox Agency as an employee of Nationwide. On this record, the only reasonable conclusion to draw is that Fox and the J. Fox Agency were independent contractors of Nationwide. Fox counters that because some of the *Bostic* factors arguably permit an inference that her relationship with Nationwide was that of employer-employee, triable issues of fact necessarily exist which preclude summary judgment.

{¶ 44} In *Barcus*, we rejected a similar argument:

> Due to the fact-intensive nature of the employee/independent contractor analysis, a trier of fact ordinarily ends up deciding whether a person is an employee or independent contractor. [*Bostic*] at 145-46. If the evidence allows reasonable minds to reach different conclusions on that question, then a trial court must deny a motion for summary judgment and submit the matter to a trier of fact. Id. at 147; *accord Brown v. CDS Transport, Inc.*, 10th Dist. No.. 10AP-46, 2010-Ohio-4606, ¶ 10. However, where the evidence is not in conflict or the facts are admitted, the trial court may determine, as a matter of law,

> whether a person is an employee or independent contractor. *Bostic* at 146.

*Id.* at ¶ 8.

{¶ 45} In this instance, our conclusion that no reasonable trier of fact could find Fox was an employee of Nationwide is based primarily on the terms of the RAE agreement and other undisputed facts. Consequently, summary judgment for Nationwide is appropriate on this case. *Barcus*; *Wolcott*.

{¶ 46} For the reasons set forth above, Fox's first assignment of error is overruled.

## B. Second Assignment of Error

{¶ 47} Fox first contends the trial court erred when it found that no issues of fact existed as to Nationwide's breach of paragraphs 25 and 30 of the RAE agreement. We disagree.

{¶ 48} In support of this claim, Fox produced evidence that Nationwide continued to use her name on certain customer cancellation notices and other correspondence for a period of three years after her cancellation of the RAE agreement. The relevant paragraphs of the RAE agreement are as follows:

> 25. **Agent Number**
>
> For the benefit of Nationwide and the Agent, a number is assigned to Agent to facilitate more efficient use of Nationwide's computer system. This number is the property of Nationwide and may be reassigned for identification within that system. Agent's name may be printed for Agent's benefit on billings and materials received by our policyholders. If this Agreement is canceled, Agent's name will be removed as soon as a new permanent agent or agency has been assigned and Nationwide's computers have been reprogrammed to identify the new agent or agency, but *Agent acknowledges that it may continue to be printed for some extended period of time after cancellation.*
>
> * * *
>
> 30. **Authorization to Direct Bill**
>
> Agent and Nationwide agree that it is to their mutual benefit for Nationwide to bill the policyholders directly, Agent hereby gives Nationwide permission to use his or her name on those

> billings and use of his or her name *for a reasonable period
> following the cancellation of this agreement.*

(Emphasis sic and added.)

{¶ 49} The trial court, in its August 4, 2017 decision on Nationwide's motion for summary judgment, made the following determination:

> [Fox] puts forth evidence of the use of her agency name by [Nationwide] on billing statements and other correspondence to Nationwide clients consistently through April 29, 2015, then once again on October 23, 2015, and finally one more time on April 24, 2017. [Fox's] Memorandum Contra, Ex. D-4. If the evidence did not reach, however sparsely, to April 24, 2017, the Court might have considered summary judgment on the matter. Yet, due to this single extended incident, the Court finds a reasonable dispute of fact exists as to whether or not [Fox's] name was removed pursuant to §25 of the RAE Agreement.[5]

(Aug. 4, 2017 Entry at 5.)

{¶ 50} Nationwide moved the trial court for reconsideration arguing the trial court erred when it considered correspondence Nationwide issued on October 23, 2015 and April 24, 2017 in ruling that issues of fact exist whether Nationwide violated paragraphs 25 and 30 of the RAE agreement because those correspondence postdated the complaint. The trial court agreed with Nationwide, and in its September 21, 2017 judgment entry, the trial court found as follows:

> [B]ecause [Fox] did not raise a claim based on Defendant Nationwide's April 2016 or April 2017 uses in her Complaint or anytime thereafter, these transactions cannot create a genuine issue of fact as to [Fox's] claims currently before the Court.
>
> Further, the Court will not permit [Fox] to amend her pleadings at this late date. Although Civ.R. 15(A) provides that courts "shall freely give leave [to amend] when justice so requires," such motions can be denied when they are untimely and prejudicial. Ohio courts have consistently held that an attempt to amend a complaint following the filing of a motion for summary judgment raises the spectre of prejudice. Here, allowing [Fox] to amend her pleadings would be inappropriate

---

[5] The trial court did not expressly rule on Fox's claim that Nationwide breached paragraph 30 of the RAE agreement.

because the parties have undergone extensive discovery and multiple rounds of dispositive motions.

[Fox] also suggests this issue can be resolved pursuant to Civ.R. 15(B), which allows a party to amend the pleadings to conform to the evidence tried by express or implied consent of the parties. However, Civ.R. 15(B) is applicable only in cases that have gone to trial, not those determined on summary judgment. * * *

Finally, even if the isolated 2016 and 2017 transactions were properly before the Court, the Court finds the evidence put forth by [Fox] in support of her remaining claims for breach of contract, false light, and invasion of privacy to be isolated incidents and not a course of conduct creating a dispute of fact as to whether [Nationwide] intentionally acted to harm [Fox].

(Quotations and citations omitted.)  (Sept. 21, 2017 Jgmt. Entry at 4-5.)

{¶ 51} In our view, the trial court reached the correct ruling but cited the incorrect provision of Civ.R. 15.  Civ.R. 15(E) provides in relevant part:

Supplemental pleadings.  Upon motion of a party the court may, upon reasonable notice and upon such terms as are just, permit him to serve a supplemental pleading setting forth transactions or occurrences or events which have happened since the date of the pleading sought to be supplemented. * * * If the court deems it advisable that the adverse party plead to the supplemental pleading, it shall so order, specifying the time therefor.

{¶ 52} A trial court ruling denying a motion to supplement a pleading will not be reversed on appeal absent an abuse of discretion. *Zestos v. Powertrain Div., GMC*, 3d Dist. No. 4-06-12, 2006-Ohio-4545.  In this instance, Fox never moved the trial court for leave to file a supplemental pleading setting forth information regarding Nationwide's use of her name on Nationwide's correspondence subsequent to 2015 and never served a pleading setting forth those allegations.  Fox argues the trial court's strict application of Civ.R. 15 essentially required her to seek leave to supplement her pleading whenever she discovered Nationwide had published correspondence in her name.  We disagree.  Had Fox simply moved the trial court for leave to supplement her complaint within a reasonable time of discovering post-complaint correspondence, the trial court could have dealt with the issue

at that time by issuing an entry setting forth "such terms as are just."  Civ.R. 15(E).  Under the circumstances, we cannot say the trial court abused its discretion in ruling the allegations regarding correspondence in 2016 and 2017 were not properly before the court in the context of its ruling on summary judgment.  Accordingly, we hold the trial court did not err when it granted summary judgment to Nationwide as to Fox's claim that Nationwide breached paragraphs 25 and 30 of the RAE agreement, albeit for slightly different reasons than those asserted by the trial court.

{¶ 53} Fox next contends that issues of fact exist whether Nationwide breached paragraph 33 of the RAE agreement by refusing, following cancellation, to refund monies she paid to Nationwide for the Riker-Gibellato book of business.  We disagree.

{¶ 54} Fox claims paragraph 33 of the RAE agreement obligated Nationwide to refund 80 percent of all monies she paid for the Riker-Gibellato book of business.  Paragraph 33 of the RAE agreement provides for a "refund payment" in the event of cancellation as follows:

> If this Agreement is cancelled by either party any time after six (6) months following the Effective Date and Agent's Payment of the First Payment (defined below in Section 48) * * * Agent shall be eligible to receive a Refund Payment of eighty percent (80%) of all monies paid to Nationwide for the Reimbursement pursuant to Section 48(B)(1) or (2). * * *
>
> * * *
>
> * * * *Agent agrees and understands that Agent shall forfeit the right to receive the Refund Payment if Agent uses or attempts to use the telephone number(s) or fax number(s) assigned to Agent's agency for any purpose other than the operation of a Nationwide agency.*  Agent shall also forfeit the right to receive any Refund Payment if Agent violates any provision of Sections 2, 17, 32 or 36.  Agent and Nationwide understand and agree that a termination of Nationwide's liability to pay Agent an Refund Payment hereunder is not be construed as liquidated damages, and is not a substitute for any of the remedies to which Nationwide may otherwise be entitled.

(Emphasis added.)  (RAE Agreement at ¶ 33.)

{¶ 55} The undisputed evidence in the record establishes that shortly after her cancellation of the RAE agreement, Fox re-affiliated herself with Allstate, continued to

occupy the office space she had used with Nationwide, and continued to use the same fax and telephone numbers J. Fox Agency had used in the RAE program. Accordingly, pursuant to the relevant provisions of the RAE agreement, Fox forfeited any right she may have had to a refund. Fox contends, however, Nationwide materially breached paragraph 47 of the RAE agreement by failing to transfer servicing rights to all of the Riker-Gibellato policies identified by Exhibit I of the RAE agreement.[6] Fox maintains Nationwide's material breach relieved her of her remaining obligations under the agreement, including the prohibition against the use of Nationwide's telephone and fax numbers. "Generally, in contract law, an insubstantial or minor breach of contract will not eliminate the parties' obligations to perform; to the contrary, a material breach will relieve the other side of its obligations under the contract." *Miller v. Walker*, 10th Dist. No. 96APE08-1070 (June 12, 1997), citing *Software Clearing House, Inc. v. Intrak, Inc.*, 66 Ohio App.3d 163, 170 (1st Dist.1990); *Kichler's, Inc. v. Persinger*, 24 Ohio App.2d 124, 126 (1st Dist.1970).

{¶ 56} According to Nationwide, Fox acknowledged, pursuant to paragraph 48 of the RAE agreement, circumstances may arise that excuse Nationwide from transferring servicing rights to all policies listed in Exhibit I. Paragraph 48(C) provides, in relevant part, as follows:

> Agent agrees and understands that the Reimbursement described in Article 48A above is based upon the anticipated assignment of the rights to service the policies set forth in the attached Exhibit I. Agent acknowledges that the Nationwide policies identified in Exhibit I may be cancelled by the policyholders at any time. Agent accepts the risk that the rights to service some of these policies may not be assigned to Agent because the policyholders cancel or non-renew the policies, or request that another Nationwide agent or distribution channel service their policies. *Agent agrees that Agent shall not be entitled to an adjustment or reduction of the Reimbursement in the event such events occur.*

(Emphasis added.)

---

[6] Paragraph 47 of the RAE agreement provides for the "Assignment of Servicing Rights" as follows: "Pursuant to this Agreement, Nationwide extends to Agent the opportunity to service the designated Nationwide-owned policies that were previously serviced by the former agency of CRAIG A RIKER and CARLO M GIBELLATO (the 'Assigned Policies'). A list of the Assigned Policies is attached hereto as Exhibit I." (Emphasis sic.)

{¶ 57} The audit of the Riker-Gibellato book of business was not completed until March 24, 2014. Fox cancelled the RAE agreement on August 29, 2014. Under paragraph 48(C), a breach of paragraphs 47 and 48(A) of the RAE agreement occurs when Nationwide fails to adjust or reduce the price paid by Fox for the Riker-Gibellato book of business to account for policies cancelled, non-renewed, or transferred other than as prescribed in paragraph 48. Paragraph 48 does not prescribe the time period or manner in which Nationwide must adjust or reduce reimbursement. Even though Fox produced evidence that Nationwide may not have transferred servicing rights to her for certain policies in the Riker-Gibellato book of business that it should have, such evidence, standing alone, does not create an issue of fact whether Nationwide committed either a breach of paragraph 47 of the RAE agreement for the purpose of contract claims or a material breach for the purpose of excusing her non-compliance with the restrictions in paragraph 33 of the RAE agreement.

{¶ 58} For the foregoing reasons, we hold the trial court did not err when it granted summary judgment to Nationwide as to Fox's breach of contract claim. Fox's second assignment of error is overruled.

### C. Third Assignment of Error

{¶ 59} In Fox's third assignment of error, she argues the trial court erred when it granted summary judgment to Nationwide on her claim for breach of implied covenant of good faith and fair dealing. We disagree.

{¶ 60} "In addition to a contract's express terms, every contract imposes an implied duty of good faith and fair dealing in its performance and enforcement." *Lucarell v. Nationwide Mut. Ins. Co.*, 152 Ohio St.3d 453, 2018-Ohio-15, ¶ 42, citing Restatement of the Law 2d, Contracts, Section 205 (1981). The Supreme Court of Ohio has recognized that " ' "[g]ood faith" is a compact reference to an implied undertaking not to take opportunistic advantage in a way that could have not been contemplated at the time of drafting, and which therefore was not resolved explicitly by the parties.' " *Ed Schory & Sons, Inc. v. Soc. Natl. Bank*, 75 Ohio St.3d 433, 443 (1996), quoting *Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting*, 908 F.2d 1351, 1357 (7th Cir.1990).

{¶ 61} " 'Good faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations

of the other party.' " *Lucarell* at ¶ 43, quoting Restatement, Section 205, comment a.  The Supreme Court has, however, "rejected the contention that a party breaches the implied duty of good faith and fair dealing merely by seeking to enforce the contract or by acting as permitted by its express terms."  *Lucarell* at ¶ 43, citing *Ed Schory & Sons* at 443-44; *Wendy's Internatl., Inc. v. Saverin*, 337 Fed.Appx. 471, 477 (6th Cir.2009); 23 Lord, *Williston on Contracts*, Section 63:22 (4th Ed.2003).  "[T]here is no violation of the implied duty unless there is a breach of a specific obligation imposed by the contract, such as one that permits a party to exercise discretion in performing a contractual duty or in rejecting the other party's performance."  *Lucarell* at ¶ 43, citing *Ed Schory & Sons* at 443-44; 23 Lord, Section 63:22; Restatement, Section 205, comment e.  Accordingly, there is no separate cause of action in Ohio for breach of the implied duty of good faith and fair dealing. *Lucarell* at ¶ 47.  *See also Interstate Gas Supply, Inc. v. Calex Corp.*, 10th Dist. No. 04AP-980, 2006-Ohio-638, ¶ 98.

{¶ 62} Because we have determined Fox failed to produce evidence creating a genuine issue of material fact regarding an alleged breach of the RAE agreement by Nationwide, we hold the trial court did not err in granting summary judgment to Nationwide as to Fox's claim for breach of an implied covenant of good faith and fair dealing.  Fox's third assignment of error is overruled.

### D.  Fourth Assignment of Error

{¶ 63} In Fox's fourth assignment of error, Fox argues the trial court erred when it determined that Fox waived her fraud claims when she executed the amended RAE agreement containing the release.  We disagree.

{¶ 64} Initially, we note Fox's fraud claims are predicated, in part, on alleged misrepresentations contained in the pro forma and business plan.  Recently, however, the Supreme Court addressed the very same claims in *Lucarell*.  In that case, a former Nationwide agent who participated in Nationwide's Agency Executive ("AE") program as it existed in 2005, filed an action against Nationwide alleging several claims for relief, including fraudulent inducement.  The trial court directed a verdict in favor of Nationwide as to that claim, but the jury returned a verdict in favor of Lucarell as to her claims for breach of contract and invasion of privacy.  The Seventh District Court of Appeals affirmed the jury verdict in favor of Lucarell on her claims for breach of contract and invasion of

privacy but reversed a directed verdict entered by the trial court in favor of Nationwide on her claim for fraud.

{¶ 65}  In reversing a directed verdict on fraud, the Seventh District concluded there were triable issues of fraud based on evidence that Nationwide led Lucarell to believe she would earn $200,000 a year in commissions when it knew or should have known that its AE program agents were failing, that sales managers had a financial incentive to recruit new program agents, and that someone fraudulently altered Lucarell's loan application to mislead the bank into giving her a loan.  *Lucarell*, 2018-Ohio-15, at ¶ 31, citing *Lucarell v. Nationwide Mut. Ins. Co.*, 7th Dist. No. 13 MA 74, 2015-Ohio-5286, ¶ 172.  In reversing the Seventh District, the Supreme Court concluded as follows:

> [A] party cannot predicate fraud on predictions or projections relating to future performance; rather, we have long recognized that to be actionable, a misrepresentation must involve a matter of fact that relates to the past or present.  *See Block v. Block*, 165 Ohio St. 365, 377, 135 N.E.2d 857 (1956); *Armstrong v. Karshner*, 47 Ohio St. 276, 24 N.E. 897 (1890), paragraph one of the syllabus.  Thus, a pro forma is "not * * * an actionable representation because it is a prediction about the future, not a statement about the past or even the present." *Bye v. Nationwide Mut. Ins. Co.*, 733 F.Supp.2d 805, 819 (E.D.Mich.2010); *see also Rorig v. Thiemann*, S.D.Ohio No. 1:05CV801, 2007 U.S. Dist. LEXIS 51653, 2007 WL 2071909, *7 (July 17, 2007) ("a proforma by definition represents figures based on financial assumptions or projections").

*Lucarell*, 2018-Ohio-15, at ¶ 63.

{¶ 66}  It is evident from Fox's complaint and her deposition testimony that many of the allegedly fraudulent representations Fox claims Nationwide made to her are merely projections of potential sales and forecasts of potential earnings based on certain assumptions.  A representation about the amount of money Fox could earn or the legitimacy and accuracy of her pro forma and business plan are not " 'a statement about the past or even the present.' "  *Id.*, quoting *Bye v. Nationwide Mut. Ins. Co.*, 733 F.Supp.2d 805, 819 (E.D.Mich.2010).  As such, they are not actionable under a fraud theory as a matter of law.

{¶ 67}  Nevertheless, the crux of Fox's allegations of fraud in this case are Nationwide's alleged misrepresentations regarding the value of the Riker-Gibellato book of

business.  Fox claims Nationwide's misrepresentations induced her to sell her successful Allstate agency, purchase the Riker-Gibellato book of business at a greatly inflated price, and agree to participate in the RAE program with Nationwide.  Fox also alleges Nationwide failed to inform her that it intended to initiate a program, after she purchased the Riker-Gibellato book of business, whereby Nationwide would reinspect certain insured properties and then cancel the policies covering those properties.  Fox claims, as a result of Nationwide's conduct in concealing this fact, she paid Nationwide for policies that she was never permitted to service.

{¶ 68} In addition to her fraud claims surrounding the Riker-Gibellato book of business, Fox claims that Nationwide made false representations about potential sales in the Michigan market when Nationwide knew it would be reducing its presence in that market, that Nationwide fraudulently concealed the fact that it intended to raise rates in Michigan and Ohio, and that Nationwide would not enforce policies prohibiting other Nationwide agents from "stealing" her customers.  (Fox Dep. at 188.)  The trial court determined that Fox released Nationwide from any liability for the alleged fraud when Fox executed the amended RAE agreement containing a waiver of claims in December 2013. We agree.

{¶ 69} " '[A] release is a binding agreement between the parties under which at least one party to the agreement relinquishes an existing claim or cause of action against another party to the agreement.' "  *Id.* at ¶ 55, quoting 29 Lord, *Williston on Contracts*, Section 73:1, at 8 (4th Ed.2003).  "[W]hen a party signs and delivers a release, that party relinquishes all claims encompassed within it and has no other contractual or other duties to perform." *Lucarell*, 2018-Ohio-15, at ¶ 56.  Absent fraud or mutual mistake, broadly worded releases are generally construed to include all prior conduct between the parties, even if the scope of such conduct or its damage is unknown to the releasor.  *Thayer v. Diver*, 6th Dist. No. L-07-1415, 2009-Ohio-2053, ¶ 54; *Haller v. Borror Corp.*, 50 Ohio St.3d 10, 13 (1990).

{¶ 70} "Whether a release operates upon a certain liability depends entirely upon the intention of the parties, which is to be gathered from the language of the release and the state of facts then existing."  *Task v. Natl. City Bank*, 8th Dist. No. 65617 (Feb. 10, 1994), citing *Whitt v. Hutchison*, 43 Ohio St.2d 53 (1975); *Kelly v. Med. Life Ins. Co.*, 31 Ohio St.3d 130 (1987), paragraph one of the syllabus; *Shifrin v. Forest City Ent., Inc.*, 64 Ohio St.3d

635 (1992). "[A]bsent fraud or mutual mistake, broadly-worded releases are generally construed to include all prior conduct between the parties, even if the scope of such conduct or its damage is unknown to the releasor." *Denlinger v. Columbus*, 10th Dist. No. 00AP-315 (Dec. 7, 2000), citing *Task* (given broad language of the release, it was incumbent on releasor to ascertain, at that time, whether he had any causes of action against defendant and, if so, to expressly manifest his intent to exclude those claims from the scope of the release).

{¶ 71} In *Denlinger*, the plaintiff, a former employee of Columbus Public Schools, sought damages from the city of Columbus for breach of contract, defamation, breach of privacy, and intentional infliction of emotional distress. The trial court dismissed the complaint because the waiver and release provisions of the separation agreement precluded plaintiff's claims.

{¶ 72} On Denlinger's appeal to this court, we noted the broadly worded separation agreement provided the former employee waived all claims "arising from or in connection with" his employment and resignation with the school. *Id.* This court determined that because the former employee's claims unquestionably arose from and/or were connected with his employment and/or resignation from employment, the release and waiver provision in the contract "clearly and unambiguously" encompassed the allegations in the complaint. *Id.* Accordingly, we affirmed the trial court's dismissal of those claims.

{¶ 73} In *Sourial v. Nationwide Mut. Ins. Co.*, 10th Dist. No. 17AP-731, 2018-Ohio-2528, this court recently determined that a release containing the same language as the release executed by Fox effectively waived fraud claims based on alleged misrepresentations made by Nationwide prior to the date of execution. In *Sourial,* a former Nationwide agent brought suit against Nationwide alleging fraudulent inducement and misrepresentation. In that case, the former agent alleged Nationwide made numerous false representations in recruiting him to join its AE program. The trial court held the former agent waived fraud claims against Nationwide when the agent executed an amended AE agreement containing a release. In *Sourial,* the release signed by the former agent provided that "[b]y signing this Amendment, [Sourial] waives all claims that he/she *has or may have* against Nationwide * * * as of the date of his/her execution of this Amendment." (Emphasis sic.) *Id.* at ¶ 38.

{¶ 74} One of the issues for this court in the agent's appeal in *Sourial* was whether the release encompassed fraud claims that may not have accrued prior to the date the former agent signed the release. In affirming the trial court, this court noted:

> [T]he language the parties used in the amended AE agreement evidences the parties' intent to waive any claims that Sourial "has or may have" against Nationwide arising out of Sourial's participation in the ACB and AE programs. (Amendment to AE Agreement at 1.) In our view, the language in the instant release is broad enough to encompass the tort claims alleged in Sourial's complaint. Thus, the language of the release clearly and unambiguously encompasses the allegations in Sourial's complaint that comprise Sourial's claims for fraud in the inducement and misrepresentation.
>
> * * *
>
> [T]o the extent Sourial has alleged an actionable claim of fraudulent inducement and/or fraudulent misrepresentation against Nationwide based on facts that existed when he executed the release, Sourial waived any such claim as a matter of law.

*Id.* at ¶ 44, 48.

{¶ 75} Here, as was the case in *Sourial*, the language the parties used in the amended RAE agreement evidences the parties' intent to waive any claims that Fox "has or may have" against Nationwide arising out of Fox's participation in the RAE program. (Amendment to RAE Agreement at 2.) Just as in *Denlinger* and *Sourial,* the evidence unquestionably shows that Nationwide made the allegedly fraudulent representations and inducements prior to the time Fox executed the release. In our view, the language in the instant release is broad enough to encompass the fraud claims alleged in Fox's complaint.

{¶ 76} Nevertheless, Fox argues she was unaware of the extent to which Nationwide misrepresented the value of the Riker-Gibellato book of business until March 2014, when the results of an internal audit revealed its true value. Accordingly, Fox maintains she did not release Nationwide from liability for fraud based on Nationwide's allegedly false and fraudulent representations regarding the value of the Riker-Gibellato book of business because the claim based on those facts had not yet accrued when she signed the release. We find Fox's argument both legally and factually flawed.

{¶ 77} Releases from liability for future tortious conduct are generally not favored by the law and will be narrowly construed.  *Denlinger*, citing *Glaspell v. Ohio Edison Co.*, 29 Ohio St.3d 44, 46-47 (1987); *Swartzentruber v. Wee-K Corp.*, 117 Ohio App.3d 420, 424 (4th Dist.1997); *see also Thompson v. Otterbein College*, 10th Dist. No. 95APE08-1009 (Feb. 6, 1996).  For example, it is error for a trial court to grant summary judgment to a defendant based on a release of liability where the release did not encompass intentionally tortious conduct that took place after plaintiff executed the release.  *Haller*.  Fox argues, under Ohio law, a party cannot release fraud claims that have not yet accrued when the release is executed.  In *Sourial*, however, this court rejected that argument:

> Sourial argues, under Ohio law, a party cannot release fraud claims that have not yet accrued when the release is executed. We disagree.  As previously stated, the operative language of the release encompasses any claims Sourial "has or may have" against Nationwide.  (Amendment to AE Agreement at 1.)  This court has previously stated that "absent fraud or mutual mistake, broadly-worded releases are generally construed to include all prior conduct between the parties, even if the scope of such conduct or its damage is unknown to the releasor." *McBroom v. Safford*, 10th Dist. No. 11AP-885, 2012-Ohio-1919, ¶ 12, citing *Task* (given broad language of the release, it was incumbent on releasor to ascertain, at that time, whether he had any causes of action against defendant and, if so, to expressly manifest his intent to exclude those claims from the scope of the release).

*Id.* at ¶ 54.

{¶ 78} Here, as was the case in *Sourial*, the authorities relied on by Fox expressing an opposing view arise primarily under federal statutory law.  *See*, *e.g.*, *Anderson v. A.C. & S., Inc.*, 154 Ohio App.3d 393, 2003-Ohio-4943 (8th Dist.) (case decided under the Federal Employees Liability Act which provides at 45 U.S.C. 55 that "[a]ny contract * * *, the purpose or intent of which shall be to enable any common carrier to exempt itself from any liability created by this act * * *, shall to that extent be void"); *Forry, Inc. v. Neundorfer, Inc.*, 837 F.2d 259, 267 (6th Cir.1988) (case decided under the federal copyright laws).  We declined to apply those authorities in *Sourial*, and we decline to apply them herein.

{¶ 79} Moreover, the only reasonable inference supported by the evidence in this case is Fox's fraud claims accrued prior to the time she executed the release.  In *Cundall v.*

*U.S. Bank*, 122 Ohio St.3d 188, 2009-Ohio-2523, the Supreme Court determined claims for fraud accrue as follows:

> "A cause of action for fraud or conversion accrues either when the fraud is discovered, or [when] in the exercise of reasonable diligence, the fraud should have been discovered. *Investors REIT One v. Jacobs* (1989), 46 Ohio St.3d 176, 546 N.E.2d 206, paragraph 2b of the syllabus; *Burr v. Stark Cty. Bd. of Commrs.* (1986), 23 Ohio St.3d 69, 76 [23 OBR 200], 491 N.E.2d 1101. When determining whether the exercise of reasonable diligence should have discovered a case of fraud, the relevant inquiry is whether the facts known ' "would lead a fair and prudent man, using ordinary care and thoughtfulness, to make further inquiry * * *." ' *Hambleton v. R.G. Barry Corp.* (1984), 12 Ohio St.3d 179, 181 [12 OBR 246], 465 N.E.2d 1298, quoting *Schofield v. Cleveland Trust Co.* (1949), 149 Ohio St. 133, 142 [36 O.O. 477], 78 N.E.2d 167." *Stokes v. Berick*, Lake App. No. 98-L-094, 1999 Ohio App. LEXIS 6264, 1999 WL 1313668, *5.
>
> As the First District has recognized, "this standard does not require the victim of the alleged fraud to possess concrete and detailed knowledge, down to the exact penny of damages, of the alleged fraud; rather, the standard requires only facts sufficient to alert a reasonable person of the *possibility* of fraud." (Emphasis added.) *Palm Beach Co. v. Dun & Bradstreet.* (1995), 106 Ohio App. 3d 167, 171, 665 N.E.2d 718. *"[C]onstructive* knowledge of facts, rather than *actual* knowledge of their legal significance, is enough to start the statute of limitations running under the discovery rule." (Emphasis sic.) *Flowers v. Walker* (1992), 63 Ohio St.3d 546, 549, 589 N.E.2d 1284.

*Id.* at ¶ 29-30.

{¶ 80} There is no doubt on this record that Fox had constructive knowledge of Nationwide's overvaluation of the Riker-Gibellato book of business prior to the time she executed the release. In her deposition, Fox testified that when she executed the original RAE agreement, the Nationwide records available to her were both out-of-date and inaccurate. Fox testified that in spring 2012, when the relevant records were updated, she became aware of problems with the Michigan policies that were included in the Riker-Gibellato book of business. Fox acknowledges that on October 29, 2013, two months before she signed the release, Fox asked a Nationwide underwriter to audit the policies in the

Riker-Gibellato book of business. There can be no doubt on this record that the facts known by Fox as early in spring 2012 would have led a reasonable person in Fox's position to suspect that Nationwide falsely represented the value of the Riker-Gibellato book of business. Prior to signing the release, Fox made an effort to determine the extent of Nationwide's overvaluation by seeking the audit. Though Fox may not have known the extent to which Nationwide had overvalued the Riker-Gibellato book of business until the audit was completed in March 2014, there is no question that Fox had constructive knowledge of the facts allegedly supporting the fraud claim prior to the date she signed the release. Accordingly, her fraud claim against Nationwide necessarily accrued prior to the date she signed the release.

{¶ 81} The same is true of Fox's remaining fraud claims. There is no factual dispute on this record that Fox knew, well before she signed the release, Nationwide had reduced its presence in the Michigan market, raised rates in Ohio, and permitted other agents to obtain servicing rights both for policies in the Riker-Gibellato book of business and other policies she had sold. Thus, Fox's fraud claims based on these allegedly false inducements, representations, and/or concealments are barred by the release as a matter of law.

{¶ 82} For the foregoing reasons, we hold the trial court did not err when it determined the release contained in the amended RAE agreement executed by Fox in December 2013 barred Fox's fraud claims in this case as a matter of law. Accordingly, Fox's fourth assignment of error is overruled.

### E. Fifth Assignment of Error

{¶ 83} In her fifth assignment of error, Fox argues alternatively that the amended RAE agreement containing the release was not enforceable due to the lack of consideration. There is, however, no factual dispute that Nationwide suspended Fox's MPP requirements for the three-month period preceding the amended RAE agreement and that the amended MPP schedule attached to the amended RAE agreement memorializes the three-month suspension. Thus, Fox's argument has no basis in fact or law.

{¶ 84} We also find no merit in Fox's contention that the release is unenforceable because Mansour fraudulently induced Fox to sign the amended RAE agreement by falsely claiming the amended RAE agreement would get her back on track to make her MPP. Given the plain language in the two-page document comprising the amended RAE agreement, no

trier of fact could conclude that Fox reasonably believed the amended RAE agreement accomplished anything other than a three-month suspension of her MPP. Accordingly, there is no factual or legal merit to Fox's argument.

{¶ 85} For the foregoing reasons, we hold the trial court did not err when it determined that the release contained in the amended RAE agreement executed by Fox in December 2013 barred Fox's fraud claims as a matter of law. Accordingly, Fox's fifth assignment of error is overruled.

### F. Sixth Assignment of Error

{¶ 86} In Fox's sixth assignment of error, Fox contends that the trial court erred by entering summary judgment in favor of Nationwide as to her claim for unjust enrichment. The trial court determined the existence of the fully integrated RAE agreement barred Fox's unjust enrichment claim as a matter of law. We agree.

{¶ 87} Under Ohio law, when "a written contract between the parties addresses the matter in dispute, the contract governs the parties' performance, unless the contract is void due to illegality, fraud, or otherwise cannot govern the relationship." *Saraf v. Maronda Homes, Inc.*, 10th Dist. No. 02AP-461, 2002-Ohio-6741, ¶ 12. Thus, in the absence of proof of bad faith, fraud, or some other illegality, the existence of a written agreement bars a claim of unjust enrichment. *Id. See also Cristino v. Admr.*, 10th Dist. No. 12AP-60, 2012-Ohio-4420, ¶ 24.

{¶ 88} There is no dispute the written RAE agreement expressly provides that Nationwide retains ownership of the policies sold by appellant under the RAE program and also sets forth the specific circumstances under which Fox may obtain a refund of monies paid to Nationwide for the Riker-Gibellato book of business. Fox has not alleged illegality of purpose, nor do the misrepresentations alleged by Fox, if proven, prevent contract formation in this case. *See* Restatement of the Law 2d, Contracts, Sections 163 and 164.

{¶ 89} For the foregoing reasons, we conclude the RAE agreement barred Fox's unjust enrichment claim as a matter of law. Fox's sixth assignment of error is overruled.

### G. Seventh Assignment of Error

{¶ 90} In Fox's seventh assignment of error, Fox argues the trial court erred by entering summary judgment for Nationwide, on reconsideration, as to Fox's claims for misappropriation of name and likeness and false light invasion of privacy. We disagree.

{¶ 91} Under a false light invasion of privacy theory, "[o]ne who gives *publicity* to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of privacy if (a) the false light in which the other was placed would be highly offensive to a reasonable person and (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed." (Emphasis added.) *Welling v. Weinfeld*, 113 Ohio St.3d 464, 2007-Ohio-2451, syllabus, adopting Restatement of the Law 2d, Torts, Section 652E (1997).  To succeed under a false light theory, the information must be made public, i.e., communicated "to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge." *Welling* at ¶ 53.

{¶ 92} Here, as the trial court noted in it decision on reconsideration, the evidence that Nationwide continued to issue correspondence using Fox's name in 2016 and 2017 was not properly before the court in the context of Nationwide's motion for summary judgment. Moreover, even if we were to consider Fox's evidence that Nationwide issued "several letters in 2016 and at least one letter in April 2017," and even if we were to conclude that falsely affiliating Fox with Nationwide would be highly offensive to a reasonable person, Fox failed to produce evidence to support the "publicity" element of her false light claim.  (Sept. 7, 2017 Reply at 12.)  Accordingly, Fox cannot recover damages under a false light theory as a matter of law.

{¶ 93} Similarly, "[i]t is only when the *publicity* is given for the purpose of appropriating to the defendant's benefit the commercial or other values associated with the name or the likeness [of another] that the right of privacy is invaded." (Emphasis added.) Restatement of the Law 2d, Torts, Section 652C, comment d (1997); *Vinci v. Am. Can Co.*, 69 Ohio App.3d 727, 729 (8th Dist.1990) ("mere incidental use of a person's name or likeness is not actionable under the 'right of publicity' ").  Having determined issues of fact do not exist regarding the "publicity" element of Fox's false light claim and given the fact Fox's misappropriation claim arises factually out of Nationwide's issuance of the same correspondence, Fox's misappropriation claim fails as a matter of law.[7]

---

[7] Fox has not appealed from the trial court's rulings related to the allegation that Nationwide continued to use Fox's name and likeness on billboard advertising following cancellation.

{¶ 94} For the foregoing reasons, we hold the trial court did not err when it granted summary judgment to Nationwide on Fox's invasion of privacy claims.  Fox's seventh assignment of error is overruled.

## V.  CONCLUSION

{¶ 95} Having overruled Fox's seven assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

TYACK and DORRIAN, JJ., concur.

_____