[Cite as *Forbes v. Nationwide Mut. Ins. Co.*, 2020-Ohio-2802.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Ruth Forbes, | : | |
| Plaintiff-Appellant, | : | |
| | | No. 19AP-220 |
| v. | : | (C.P.C. No. 14CV-4944) |
| Nationwide Mutual Insurance Company, | : | (REGULAR CALENDAR) |
| Defendant-Appellee. | : | |

D E C I S I O N

Rendered on May 5, 2020

**On brief:** *James R. Leickly* and *William P. Tedards, Jr.,* for appellant. **Argued:** *William P. Tedards, Jr.*

**On brief:** *Bricker & Eckler LLP, Quintin F. Lindsmith,* and *Ali I. Haque,* for appellees. **Argued:** *Ali I. Haque.*

APPEAL from the Franklin County Court of Common Pleas

NELSON, J.

{¶ 1} Plaintiff-appellant Ruth Forbes appeals from the decision of the Franklin County Court of Common Pleas granting summary judgment in favor of Nationwide Mutual Insurance Company ("Nationwide") on her breach of contract and conversion claims. We conclude after reviewing the matter afresh ("de novo") that Nationwide was entitled to summary judgment on each claim, and accordingly we affirm the judgment of the trial court.

{¶ 2} The trial court's March 13, 2019 Decision and Entry thoroughly lays out the relevant facts as reflected in the record. Ms. Forbes and Nationwide entered into two agreements in June of 2006 that governed her performance selling Nationwide insurance policies from her Virginia office. The first was the Independent Contractor Agent's

Agreement, or "IC Agreement," that appointed Ms. Forbes "as an agent to represent [Nationwide] in Virginia." *See* Third Amended Complaint, Ex. 2. Nationwide agreed to provide Ms. Forbes "with certain manuals, forms, records, and such other materials and supplies as are necessary in the conduct of an insurance business," but specified that "[a]ll such property * * * shall remain the property of [Nationwide] and shall be returned to [Nationwide] in good condition upon any cancellation of" the IC Agreement. *Id.* at ¶ 1. The agreement also stated: "Upon termination of this Agreement, you agree to return all Confidential Information, and all copies thereof, to [Nationwide] immediately." *Id.* at ¶ 7. Confidential Information included "customer policy information." *Id.*

{¶ 3} The second agreement was the Agency Executive Program Performance Agreement, or "AE Agreement," relating to the performance levels that Nationwide required Ms. Forbes to meet. *See* May 22, 2017 Third Amended Complaint, Ex 1. The sales marks were set forth in the "Minimum Production Plan" attached to the original AE Agreement (but not attached to this document in the record). The AE Agreement stated: "All requirements of the Minimum Production Plan must be met on a monthly basis throughout the term of this Agreement beginning on the effective date of the Minimum Production Plan, including DWP, Life Commissions, and Life Sales. Nationwide shall, in its sole discretion, measure the achievement of Agent. The Sales Results Report (1361) monthly data will be used to calculate DWP, Life Sales, and Life Commissions." *Id.* at 1-2. "DWP" referred to Total Direct Written Premium, defined as "[t]he sum of all of Agent's direct written premiums from Nationwide Property/Casualty policies." *Id.* at 1.

{¶ 4} In its original iteration, the AE Agreement provided a "Production Period" of 36 months that could be extended by Nationwide in its discretion for "up to three * * * months if Agent [Forbes] is not meeting the Minimum Production Plan during the final three (3) months of the original Production Period." *Id.* Ms. Forbes "further agree[d] * * * that failure to meet the requirements of the Minimum Production Plan may result in termination of Agent's Nationwide Agent's Agreement." *Id.* at 2. Ms. Forbes also agreed to "meet the requirements of a training and development program" consisting of "continuing education on the products, coverages, and regulations that govern [the insurance] industry." *Id.* at 5. Also pursuant to the agreement, Nationwide extended an interest-free loan to Ms. Forbes, and provided her the opportunity, conditioned on her attaining certain

sales goals in relation to the Minimum Production Plan, to have at least some of the loan balance forgiven. *Id.* at 3-5. Shortly after entering into the AE Agreement, Ms. Forbes executed a promissory note to Nationwide in the amount of $258,000. May 7, 2014 Complaint, Ex. 3.

{¶ 5} The parties formally modified that AE Agreement three times. They entered into the First Modification on April 24, 2008. *See* Third Amended Complaint, Ex. 3. The First Modification extended the Production Period to 72 months, provided a graduated Modified Minimum Production Plan that set a final DWP requirement of $1,749,880 (for month 72), provided for periodic "capital infusion" payments in lieu of "further Loan disbursements" upon meeting certain production goals, and specified the education and development courses that Ms. Forbes was required to complete. *Id.* at 2, 8, Ex. A, Ex. C, and Ex. D. In addition, the First Modification altered the language governing the calculation of DWP: "P&C DWP shall be defined herein as the sum of all of Agent's direct written premiums from Nationwide P&C policies during the previous 12 month period and shall be calculated on a 12 month moving basis as outlined in Exhibit A to this Modification. * * * Nationwide shall, in its sole discretion, measure the achievement of Agent. The monthly P&C DWP and Life Sales data shall be measured by use of the Sales Results Report (Form No. 1361), or other such form developed by Nationwide in its sole discretion for use in making such determination." *Id.* at 3.

{¶ 6} As so modified, the Agreement again specified that: "All requirements of the Modified Minimum Production Plan must be met on a monthly basis thr0ughout the term of this Agreement." *Id.* It set out increasing month-by-month DWP requirements through month 72. *Id.* at Attachment A. It also recited that "[i]n order to successfully complete the Modified AE Program, Agent understands and agrees that Agent must: (1) meet or exceed the Year 6 P&C DWP on or before the conclusion of the seventy-two (72) month production period; [and] (2) complete all education and development requirements * * *." *Id.* at 4. The First Modification also provided that Ms. Forbes would "release[] and discharge[] Nationwide * * * of any and all claims or causes of action * * * in any way relating to the AE Program, the AE Agreement, and the IC Agreement from the beginning of time to the present * * *." *Id.* at 11.

{¶ 7} "Somewhere around October of 2008," Ms. Forbes began to believe that there was a discrepancy between the DWP amounts with which she thought she should be credited and the amounts actually reflected in Nationwide's reports. *See, e.g.,* Forbes Deposition at 229. She communicated her concerns about Nationwide's calculations to her sales manager, Gary Edgerton, at that time, and continued to track the perceived differences and communicate with Nationwide about the issue until the end of her tenure as an agent. *Id.* at 71, 96-98.

{¶ 8} On June 17, 2010, the parties once again altered Ms. Forbes's production requirements. The Second Modification to the AE Agreement "canceled and replaced" the First Modification's Modified Minimum Production Plan attachment with a new one that specified new, lower monthly DWP requirements, ending with a month-72 figure of $1,537,428. Third Amended Complaint, Ex. 4 at 1, Ex. A. Like the First Modification, the Second Modification contained a release requiring Ms. Forbes to release and discharge "all claims or causes of action Agent has in any way relating to the AE Program, the AE Agreement, and the IC Agreement from the beginning of time to the present * * *." *Id.* at 2.

{¶ 9} Ms. Forbes says that she received a communication from Nationwide on March 30, 2012, confirmed by email of February 19, 2013, stating that while the Second Modification had changed her "minimum production requirements to $1,537,428 in Nationwide DWP at the end of Month 72," she "would be eligible to transition to career status if [she] met 95%" of that figure; specifically, she would qualify if she were to achieve "$1,460,556.60 in Nationwide DWP, [have] completed all of [her] Training and Development requirements and [have] passed [her] fiduciary audit." *See* October 27, 2017 Memorandum in Opposition to Summary Judgment, Ex. 2.

{¶ 10} On May 18, 2012, Nationwide sent Ms. Forbes a demand letter stating that her loan had been "deemed non-collectable" by the guarantor and that her "outstanding debt" owed was $183,481.82. Ms. Forbes had stopped making payments, believing that Nationwide was basing the payment amounts on "incorrect" calculations of DWP. Forbes Deposition at 13 (also noting at 18 that there was to have been some loan forgiveness for achieving DWP figures).

{¶ 11} The parties then executed their Third Modification to the AE Agreement in September 2012. *See* Forbes Deposition, Ex. 10 and Appellant's Brief at 10-11

(acknowledging joint agreement and execution). The Third Modification, acknowledged as supported by "good and valuable consideration," Third Modification at 1, again specified that the Production Period as contained in the AE Agreement as modified by the First Modification would "end at the conclusion of the sevent[y]-second (72nd) full month," but altered that period so as "to suspend Agent's seventy-two month production schedule for the six month period beginning February 1, 2012 and ending July 31, 2012." The agreed result was that Ms. Forbes's "production schedule * * * will conclude at the end of the seventy-second (72nd) month, which [accounting for the suspended period] is March 31, 2013." *Id.* Like the previous modifications, the Third Modification contained a release of claims, but Ms. Forbes crossed out the release language, initialed the crossed-out provision, and signed the document on September 10, 2012. *Id.* Nine days later, a Nationwide Regional Vice-President initialed the crossed-out release and signed the Third Modification. *Id.*

{¶ 12} Nationwide terminated the IC Agreement and the AE Agreement in May of 2013, citing Ms. Forbes's failure to meet the Modified Minimum Production Plan requirements. Third Amended Complaint at ¶ 5; June 13, 2017 Answer at ¶ 12. On May 24, 2013, she received a package from Nationwide containing a letter terminating her contracts and instructing her to "[p]repare files for pick up (this does not include any broker business)." August 4, 2017 Third Affidavit of Ruth Forbes (Forbes Deposition, Ex. 3) at ¶ 3-4. Because Ms. Forbes found the directive "unclear," she called sales manager Edgerton for "clarification." *Id.* at ¶ 4. Ms. Forbes avers that she was instructed "to turn over, not only any remaining documents I might have reflecting Nationwide policyholder activity, but also all of my own historical files and records on all my clients," including non-Nationwide clients she had developed over "thirty years" during her pre-Nationwide tenure. *Id.* According to Ms. Forbes, Mr. Edgerton asserted that all of her "client files and all contents within belonged to Nationwide," and that she "had 'no choice' but to prepare those files for pickup," even after she had "explained that more than half of the 1000 plus client files were [her] prior clients with multiple policies before coming to Nationwide." *Id.* at ¶ 5-6. Ms. Forbes discussed the situation with her daughter and the two "agreed that [they] would proceed to get the files prepared for pickup as directed by Gary." *Id.* at ¶ 8. Ms. Forbes's lawyer emailed a Nationwide representative on June 11, 2013 "to confirm that Ms. Forbes

will make Nationwide's files and customer information available for pick up on Wednesday, June 11, 2013 at 9:00 a.m. at her former Nationwide agency location." Forbes Deposition, Ex. 4.

{¶ 13} Ms. Forbes filed suit against Nationwide almost a year later, on May 7, 2014. Her suit originally claimed violation of R.C. 4111.03, the Ohio Minimum Wage Act; fraudulent inducement; intentional misrepresentation; breach of contract; wrongful termination in violation of public policy; a violation of R.C. 1335.11, the Ohio Wage Act, for failure to pay commissions; and promissory estoppel. May 7, 2014 Complaint. Nationwide counterclaimed for breach of the promissory note, seeking a claimed $171,478.34 unpaid balance on the loan to Ms. Forbes. Nationwide obtained dismissal of several of the original claims and Ms. Forbes amended the complaint twice before she eventually filed her Third Amended Complaint. That version asserted claims for breach of contract ("including [the] covenant of good faith and fair dealing"); unjust enrichment; and conversion (based on Nationwide's destruction of the client files, which occurred after this litigation commenced). May 22, 2017 Third Amended Complaint.

{¶ 14} Nationwide moved for summary judgment, which the trial court granted on all claims. The trial court ruled that the release provision in the Second Modification barred Ms. Forbes's claims because she "testified [that] she first became aware of Nationwide's alleged breach of the AE Program contracts in 2008," and she therefore "at least had constructive knowledge of Nationwide's possible faulty tracking of DWP numbers prior to, or at the time she signed the Second Modification on June 17, 2010." March 13, 2019 Decision at 21. Even without the release, the trial court ruled, the breach of contract claim would fail on its merits because: Ms. Forbes had failed to "identify any contractual provision/term breached by Nationwide"; her assertion that Nationwide was required to use "monthly compensation statements to measure the success of her agency" was inconsistent with the AE Agreement's grant of "sole discretion" to Nationwide regarding the measurement of DWP; and Ms. Forbes "admittedly failed to complete the educational training required under the contracts and defaulted on the loan" she took out. *Id.* at 22-24. The trial court also ruled that Ms. Forbes's conversion claim failed because she "was not an 'owner' of the files to the extent the files were about Nationwide policies and customers," and she had "implicitly consented" to the taking of the information she had "selected and

packed up * * * for pick up by Nationwide." *Id.* at 27-28. The trial court ruled in Nationwide's favor on the unjust enrichment claim, too; Ms. Forbes has not appealed from the judgment against her on that count.

{¶ 15} As to Nationwide's counterclaim, the trial court held: "As Forbes has failed to make any argument challenging Nationwide's status as a holder of the note, the amount due, or the facts regarding notice of default and acceleration, the Court finds the evidence in the record, even when construed in favor of Forbes, demonstrates Nationwide is entitled [to] a judgment in its favor on the note in the total amount of $171,478.34 plus interest at the statutory rate from the date of this judgment." *Id.* at 29. Ms. Forbes does not appeal from the counterclaim judgment (as predicated on the loan, with the balance not having been reduced given Nationwide's view that Ms. Forbes had failed to attain the requisite DWP thresholds).

{¶ 16} Ms. Forbes has, however, appealed the dismissal of her breach of contract and conversion claims. Her first assignment of error states: "The trial court erred as a matter of law in granting Defendant/Appellee Nationwide Mutual Insurance Company's Motion for Summary Judgment on Count 1 of the Third Amended Complaint (Breach of Contract including the Covenant of Good Faith and Fair Dealing)." Her second assignment urges: "The trial court erred as a matter of law in granting Defendant/Appellee Nationwide's Motion for Summary Judgment on Count 4 of the Third Amended Complaint (Conversion)." Appellant's Brief at v.

{¶ 17} We apply a de novo standard to a trial court's decision granting summary judgment, and the analysis is "governed by the standard set forth in Civ.R. 56." *Comer v. Risko*, 106 Ohio St.3d 185, 2005-Ohio-4559, ¶ 8. The de novo standard of review encompasses matters of law, including the interpretation and construction of written contracts. *Long Beach Assn. v. Jones*, 82 Ohio St.3d 574, 576 (1998). Under this standard, we give no deference to a trial court's interpretation of legal issues. *See, e.g., Holt v. State*, 10th Dist. No. 10AP-214, 2010-Ohio-6529, ¶ 9. Thus, we examine the grant of summary judgment afresh, conducting " 'an independent review of the record and stand[ing] in the shoes of the trial court.' " *See Bae v. Dragoo & Assocs.*, 10th Dist. No. 03AP-254, 2004-Ohio-544, ¶ 6, quoting *Mergenthal v. Star Banc Corp.*, 122 Ohio App.3d 100, 103 (12th Dist.1997).

{¶ 18} Pursuant to Civil Rule 56, summary judgment "shall be rendered forthwith" if the pleadings and evidentiary quality materials "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." It "shall not be rendered unless it appears from the evidence * * * that reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion * * * is made, [with the evidence] construed most strongly" in that party's favor. Civ.R. 56(C); *see also, e.g., Bostic v. Connor*, 37 Ohio St.3d 144, 146 (1988), *superseded by statute on other grounds* as stated in *Slauter v. Klink*, 2d Dist. No. 18150, 2000 Ohio App. LEXIS 3716 (Aug. 18, 2000). The moving party must identify those portions of the record that "demonstrate the absence of a genuine issue of material fact on the essential element(s) of the nonmoving party's claims," and the nonmoving party then cannot rest on the mere allegations of the pleadings, but must point to specific facts showing a genuine question for trial. *Dresher v. Burt*, 75 Ohio St.3d 280, 294 (1996); *see also, e.g., Payne v. Ohio Performance Academy, Inc.*, 10th Dist. No. 17AP-202, 2017-Ohio-8006, ¶ 13.

{¶ 19} As to her contract claim, Ms. Forbes argues that the trial court erred by disregarding an expert report that used Nationwide "Compensation Statements" to assess DWP. Appellant's Brief at 21. She maintains that the Compensation Statements provide the best available way to satisfy the "purpose of the Minimum Production Requirement as stated by Nationwide's Rule 30(B)(5) witness -- determining viability by measuring commission flows," because "Nationwide refuses to reveal any information or data to support the unreconciled * * * numbers" in its Program Agency Performance Report—the form that Nationwide elected to use in determining DWP. *Id.* at 21-22. Ms. Forbes also argues that "Nationwide did *not* exercise its discretion in good faith and in accordance with fair dealing, when, confronted with incontestable evidence that Ms. Forbes did her job and met the minimum production requirement, it chose to terminate her contract anyway." *Id.* at 24-25.

{¶ 20} In response, Nationwide argues, as it did to the trial court, that Ms. Forbes's deposition testimony demonstrates that she cannot "identify a single term breached by Nationwide." Brief of Appellee at 27. Nationwide submits that Ms. Forbes's assertion that it was obliged to calculate DWP based on Compensation Statements is an attempt to assert an independent claim for breach of a covenant of good faith and fair dealing, which is not

recognized as a freestanding claim under Ohio law; her theory, says Nationwide, does not rely on a breach of any term of the parties' agreements. *Id.* at 28-29. Moreover, Nationwide urges that Ms. Forbes's arguments are without factual foundation in admitted evidence. *Id.* at 30-31. And Nationwide argues that the language of the AE Agreement and the First Modification, granting it "sole discretion" to measure an agent's performance and to "measure[]" DWP "by use of the Sales Results Report (Form 1361), or such other form developed by Nationwide * * * for use in making such determination," *see* First Modification, allowed it to use the "agency synopsis reports to measure DWP production, as it does with all Nationwide agents. Nothing in the AE Agreement allowed Forbes to decide which reports to use to measure her DWP." *Id.* at 32.

{¶ 21} The Third Amended Complaint did lay out Ms. Forbes's theory of breach: it was specifically predicated on the Second Modification. "Nationwide's May 24, 2013 termination of Ms. Forbes' contracts for failure to meet the modified P&C DWP minimum production plan breached the Second Modification, as revised by the March 2012 [95% communication], which set the minimum requirement at $1,460,556. * * * Ms. Forbes met and exceeded the minimum production requirement well in advance of the conclusion of the 72-month production period." Third Amended Complaint at ¶ 15-16. (Ms. Forbes had sought also to advance a contract claim relating to the calculation of "her commissions after executing the Second Modification," *id.* at ¶ 17, but she abandoned that commissions claim during the course of the litigation. *See, e.g.,* Forbes Deposition at 279.)

{¶ 22} As an initial matter, and viewing the evidence in the light most favorable to Ms. Forbes, we cannot conclude that the release language to which she assented in 2010 as part of the Second Modification bars her contract claim here. "A release is an absolute bar to a later action on any claim encompassed within it, absent a showing of fraud, duress, or other wrongful conduct in procuring it." *Lucarell v. Nationwide Mut. Ins. Co.*, 152 Ohio St.3d 453, 2018-Ohio-15, ¶ 48. " 'Whether a release operates upon a certain liability depends entirely upon the intention of the parties, which is to be gathered from the language of the release and the state of facts then existing.' " *Fox v. Nationwide Mut. Ins. Co.*, 10th Dist. No. 17AP-745, 2018-Ohio-2830, ¶ 70, citations omitted (adding at ¶ 77 that "[r]eleases from liability for future tortious conduct are generally not favored by the law and will be narrowly construed"). In the usual course, " 'a release [of liability] is a binding

agreement between the parties under which at least one party to the agreement relinquishes an existing claim or cause of action against another party to the agreement.' " *Lucarell* at ¶ 55, quoting *Williston on Contracts*, Section 73:1, at 8 (4th Ed.2003)

{¶ 23} The release contained in the Second Modification specified that it worked to discharge Nationwide of "all claims or causes of action Agent has in any way relating to the AE Program * * * from the beginning of time to the present [June of 2010], including * * * breach of contract." Second Modification at 2. The trial court correctly noted that when she signed that modification, Ms. Forbes "knew, or should have reasonably known, * * * that Nationwide's tracking of her agency's production was based on information other than what she thought should or could be considered under the AE Program contracts * * *." Decision and Entry at 22. But, as the trial court also noted, " ' "[a] cause of action for breach of contract does not accrue until the complaining party suffers actual damages as a result of the alleged breach." ' " *Id.* at 20, quoting *Kincaid v. Erie Ins. Co.*, 128 Ohio St.3d 322, 2010-Ohio-6036, ¶ 13, further citation omitted. And the claimed breach of which Ms. Forbes complains is her 2013 termination, from which she had not suffered damages when she agreed to the release in 2010. This case differs in that respect from *Fox*, where "the only reasonable inference supported by the evidence * * * [was that] Fox's fraud claims accrued prior to the time she executed the release." 2018-Ohio-2830, at ¶ 79. And it differs from *Sourial v. Nationwide Mut. Ins. Co.*, 10th Dist. No. 17AP-731, 2018-Ohio-2528, ¶ 45, where again the plaintiff "acknowledged * * * that the fraudulent conduct alleged in [his] complaint * * * occurred prior to the date" he signed the release. Because Ms. Forbes's contract claim involving her (post-release) termination is not necessarily akin to the (pre-release) tortious conduct alleged in *Fox* and *Sourial*, we do not think that the release provided grounds for summary judgment here.

{¶ 24} Nonetheless, Ms. Forbes's undisputed knowledge, from at least October 2008 forward, that Nationwide was determining DWP in its own way instead of in the manner in which she would have wished, does eviscerate her contract claim. When Ms. Forbes entered into the Second Modification (invoked by her Third Amended Complaint) and again when she executed the Third Modification, she knew full well of the divergence between her calculations and calculation methodologies and Nationwide's. *See, e.g.,* Forbes Deposition at 229 (Q. "at what point in time is it that you thought or believed that

there was a discrepancy between what Nationwide was telling you it believed its DWP numbers to be and what you thought your DWP numbers were?" A. "Somewhere around October of 2008 it started"); *see also id.* at 96 ("when I saw in 2008 * * * around * * * October, the numbers went in the adverse direction when we were steadily moving forward, that's when I made contact with Mr. Edgerton and we had a conversation about it. I continued to watch and began to print reports and make comparisons * * * "); 98 (Q. "so from 2008 to 2010 * * * you continued to track this type of information because you * * * were concerned that Revenue Connection continued to not track correctly your agency's activities, correct?" A. "Correct."); 99 (her tracking moved from handwritten ledgers to computerized spreadsheets: Q. "so from 2010--by 2010, do you think it was in electronic format?" A. "It was.").

{¶ 25} Thus by the time that her DWP was reduced from a month 72, twelve-month-moving figure of $1,749,000 (which she does not claim ever to have met, even by her own calculations as based on Compensation Statements) to $1,537,428 (in the 2010 Second Modification), or to 95 percent of that (pursuant to the March 30, 2012 communication she invokes), and also by the time that Nationwide agreed to extend the 72-month end date to March 31, 2013 (in the Third Modification), she knew that she and Nationwide calculated DWP very differently. She offers no legally cognizable argument for claiming the benefit of those mutual modifications while simultaneously asserting an extra-contractual unilateral right to employ Compensation Statements as the basis for DWP determination.

{¶ 26} The express terms of the contract itself, a contract mutually modified three times before the termination of which she complains, leave that determination exclusively to Nationwide: "Nationwide shall, in its sole discretion, measure the achievement of Agent. The monthly * * * DWP * * * shall be measured by the use of the Sales Results Report (Form No. 1361), or such other form developed by Nationwide in its sole discretion for use in making such determination." First Modification (2008) at 3. In making its DWP "determination," Nationwide chose to "measure[]" DWP by agency synopsis reports (also referred to as Program Agent Performance Reports) that determined DWP levels for Ms. Forbes—levels that she concedes did not meet the contractual standards. *See, e.g.,* Appellant's Reply Brief at 4-5 (quoting opinion of Ms. Forbes's expert that the DWP amounts "per the Program Agent Performance Reports – Agency Synopsis do not [correlate

with] the direct written premium amounts per the * * * Compensation Statements for the fourteen months examined. We are not aware of any current information or data that would reconcile these differences. Without this reconciliation we cannot give an opinion as to the accuracy of the information in the Program Agent Performance Reports – Agency Synopsis") (emphasis omitted). As the trial court said, Ms. Forbes "agreed [that] nothing within the AE Program contracts required Nationwide to use compensation statements to measure DWP. [Forbes Deposition at 215] * * * * [U]nder the AE Program contracts, Nationwide did not have to use monthly compensation statements to measure DWP, and * * * Nationwide, in its sole discretion, could decide how to measure DWP." Decision and Entry at 23.

{¶ 27} Ms. Forbes falls back, therefore, on a contention that Nationwide breached a duty of good faith and fair dealing by exercising that discretion to use the Performance Reports and not the Compensation Statements. "In addition to a contract's express terms, every contract imposes an implied duty of good faith and fair dealing in its performance and enforcement." *Lucarell*, 2018-Ohio-15, at ¶ 42, citation omitted. "[T]here is no violation of the implied duty unless there is a breach of a specific obligation imposed by the contract, such as one that permits a party to exercise discretion in performing a contractual duty or in rejecting the other party's performance." *Id.* at ¶ 43, citing *Ed Schory & Sons, Inc. v. Soc. Natl. Bank,* 75 Ohio St.3d 433, 443-44 (1996). That is what we understand Ms. Forbes to argue here.

{¶ 28} But " '[g]ood faith' is a compact reference to an implied understanding not to take opportunistic advantage in a way that could have not been contemplated at the time of drafting, and which therefore was not resolved explicitly by the parties." *Lucarell* at ¶ 42, quoting *Ed Schory & Sons* at 443-44 (further citation omitted). Ms. Forbes adduces no evidence that it "could not have been contemplated" when the original contract was formed in 2006 or at the time of the First Modification in 2008 that Nationwide would not use Compensation Statements to calculate DWP; the contract originally specified that "[t]he Sales Results Report ([form] 1361) monthly data will be used to calculate DWP" (and Ms. Forbes does not even invoke that Report to us, at least by name, or describe what her levels would have been pursuant to that specified form), and the contract then was changed to reference the "Sales Results Report (Form 1361), or such other form developed by

Nationwide in its sole discretion for use in making such determination."  *See* 2006 AE Agreement at Article 2; First Modification at 3; *compare* Decision and Entry at 23 ("There is no evidence demonstrating that Nationwide measured/tracked DWP numbers for Forbes' agency in a manner inconsistent with the terms of the original AE Agreement or First Modification").

{¶ 29} And again, by the time in 2010 that the required DWP levels were reduced by the Second Modification to bring Ms. Forbes within the striking distance that she argues according to her own chosen (Commission Statements) method of calculation and by the 95 percent communication of 2012, *see* Complaint at ¶ 15 (relying on Second Modification and related 2012 communication), Ms. Forbes was under no illusion at all that she and Nationwide were calculating her DWP the same way.  Having tracked the disparity for years by that point, *see* Forbes's Deposition at 96-99, she can point to no evidence that the difference "could not have been contemplated" at the time of the contract modifications on which she relies.  We have underscored that the Supreme Court of Ohio has conditioned good faith enforcement of a contract on " 'consistency with the justified expectations of the other party,' " *Sourial*, 2018-Ohio-2528, at ¶ 31, quoting *Lucarell* at ¶ 43.  Especially having opted to enter into the Second and Third Modifications reducing the DWP requirements and suspending their application for six months, Ms. Forbes has no room to argue that she would have been justified in expecting that the modified contract provided her with discretion to specify the measure for determining whether she had met those requirements. *Compare, e.g., Greenzalis v. Nationwide Mut. Ins. Co.*, 10th Dist. No. 16AP-382, 2016-Ohio-8344, ¶ 22, 24, 26 (modified AE Agreement controlled; "appellant undisputedly chose to sign a modification").

{¶ 30} The trial court was correct to enter summary judgment against Ms. Forbes's contract claim:  the contract never bound Nationwide to use Compensation Statements or forms reconciled to Compensation Statements in determining agent DWP levels, and there is no evidence of a breach of a duty of good faith and fair dealing in Nationwide's use of Agency Synopsis Reports in making that determination.

{¶ 31} What is more, it is undisputed that at the end of March 2013—the end of the 72-month Production Period, as specified in the Third Modification—Ms. Forbes fell short of her required DWP level, even by her own calculations as based on Compensation

Statements. Ms. Forbes's deposition is clear on this point: Q. "What is the position you're taking today was the 12-month moving DWP number for your agency as of March 2013?" A. "1,399,308.54." Q. "Can you say that again, please." A. "1,399,308.54." Forbes Deposition at 269. That result does not meet the month 72 requirement of $1,537,428 set forth in the Second Modification, or the 95 percent figure (of $1,460,556.60) referenced in the 2012 and 2013 communications.

{¶ 32} The original AE Agreement had provided that "[a]ll requirements of the Minimum Production Plan must be met on a monthly basis throughout the term of this Agreement, * * * including DWP * * *." 2006 AE Agreement at Article 2. Similarly, the First Modification provided that "[a]ll requirements of the Modified Minimum Production Plan must be met on a monthly basis throughout the term of this Agreement, including the Property and Casualty Direct Written Premium ('P&C DWP')." First Modification at 3. Ms. Forbes attempts to respond to this requirement that an agent meet her DWP level every month by noting other language from the First Modification that "Agent must: (1) meet or exceed the Year 6 * * * DWP on or before the conclusion of the seventy-two (72) month production period; [and] (2) complete all education and development requirements * * * ," First Modification at 4, then arguing that she met monthly DWP requirement "repeatedly" by her calculations, *see* Appellant's Brief at 19-20, and concluding that her DWP obligation would have ended at that point. But that position, envisioning on this record Ms. Forbes's early "graduation" from the program, *see* Forbes Deposition at 272, does not square with the language of the contract or with the history of the modifications.

{¶ 33} Ms. Forbes asserts, for example, that under her methodology, she met what she saw as DWP requirements for early graduation in "October of 2011." *Id.*; *see also id.* at 356 (agency hit $1,467,178 in October 2011). But the parties entered into their Third Modification almost a year after that, in September 2012. That Modification, the validity of which Ms. Forbes does not contest and which was made well after Ms. Forbes was notified of her loan default, *see* Forbes Deposition at 37, made clear (if any further clarity was necessary) that her DWP requirements were ongoing. It also reestablished a fixed end date for the Production Period: "her production schedule * * * *will conclude* at the end of the seventy-second (72nd) month, which is March 31, 2013." Third Modification at 1 (emphasis added); *see also* Appellant's Brief at 7 (March [31], 2013 was "the end of Ms.

Forbes' program"). Further still, when asked at her deposition whether she had understood "that as part of your participation in the AE program that you were required on a monthly basis to meet the minimum production requirements set forth in your contract for P&C DWP," Ms. Forbes answered, "Yes." Forbes Deposition at 218. (Even beyond that, Ms. Forbes also acknowledges that she never raised the issue of early graduation with Nationwide and "did not" satisfy the education and training requirements specified in her contract. Forbes Deposition at 273.)

{¶ 34} So even were Ms. Forbes's reading and use of her Compensation Statements to govern determination of her DWP achievement, she would by her own terms not have met the required level at the last month of the defined 72-month period.

{¶ 35} In light of the analysis sketched above, we need not reach the trial court's further, alternative finding that summary judgment on the contract claim was appropriate because Ms. Forbes had failed to satisfy her contractual obligations to complete the education and training requirements. *Compare* Decision and Entry at 24. The trial court did not err when granting summary judgment in Nationwide's favor on Ms. Forbes's breach of contract claim, and we overrule the first assignment of error.

{¶ 36} Ms. Forbes's second assignment of error, urging that the trial court was wrong to grant summary judgment against her conversion claim, fails as well. We note initially that despite various references in Ms. Forbes's arguments in briefing to us, the conversion claim—based on her allegation that "[b]y discarding or destroying Ms. Forbes' files [at some time after February 2014], Nationwide * * * wrongfully exercised dominion over her property to the exclusion of her rights," Third Amended Complaint at ¶ 35—is *not* pled or appropriately analyzed here as a claim of "spoliation" of evidence. *Compare* Appellant's Brief at 28 *with* Reply Brief at 17 (urging that "deliberate shredding was also an act of spoliation" giving rise to adverse inferences, but acknowledging that there is no "independent spoliation claim").

{¶ 37} Under Ohio law, "conversion is 'the wrongful exercise of dominion over property to the exclusion of the rights of the owner, or withholding it from his possession under a claim inconsistent with his rights.' " *Wells Fargo Bank, N.A. v. Sessley*, 188 Ohio App.3d 213, 2010-Ohio-2902, ¶ 32 (10th Dist.), quoting *Joyce v. Gen. Motors Corp.*, 49 Ohio St.3d 93, 96 (1990). However, "a party who consents to the manner by which another

deals with his property is estopped from asserting a claim for conversion." *Ahlers v. Pettinelli*, 8th Dist. No. 86257, 2006-Ohio-1199, ¶ 16 (citation omitted). Ms. Forbes advises us that Virginia law, which she thinks applicable to this claim, is to an effect quite "similar" to Ohio's law of conversion. *See* Appellant's Brief at 30-31, citing *PGI, Inc. v. Rathe Prods., Inc.*, 265 Va. 334, 344, 576 S.E.2d 438 (2003) (conversion includes "act of dominion wrongfully exerted over property in denial of the owner's right"); *compare* AE Agreement at Article 14 (which does not govern choice of law on non-contract issues: "This Agreement shall be deemed to have been made under and governed by the laws of the State of Ohio without regard to Ohio's choice of law rules").

{¶ 38} Ms. Forbes argues that although she herself turned the files over to Nationwide, after her counsel had "confirmed" with Nationwide that Nationwide's "files and customer information would be available for pick up," *see* Frederick Affidavit at ¶ 5-6, and although she "did not attempt to physically confront Nationwide [representatives] to block them from taking" the files she provided to them, the "taking" occurred "under duress." Appellant's Brief at 28.

{¶ 39} The trial court correctly ruled that Ms. Forbes "was not an 'owner' of the files to the extent the files were about Nationwide policies and customers." Decision and Entry at 28. Moreover, the trial court held, by turning over the files to Nationwide under the undisputed facts of record, Ms. Forbes "implicitly consented to the taking of those files as she – with the assistance of family and staff – selected and packed up all the hard copy files for pick up by Nationwide, and did not immediately [or for years] demand return of the files once she discovered [in her view that they] included non-Nationwide client information." *Id.*, citing *Cedar Creek Mall Properties, L.L.C. v. Krone*, 8th Dist. No. 104863, 2017-Ohio-7884; *Devil's Advocate, LLC v. Zurich Am. Ins. Co.*, Case No. 1:13-cv-1246, 2014 U.S. Dist. Lexis 146449 (E.D.Va. Oct. 10, 2014).

{¶ 40} On our de novo review, we find no error in that assessment that Ms. Forbes effectively (in both senses of the word) consented to the transfer of the files at issue. Given her description of her own efforts to prepare the files for Nationwide to pick up, as well as her attorney's notification to Nationwide "to confirm that Ms. Forbes will make Nationwide's files and customer information available for pick up on Wednesday, June 11, 2013 at 9:00 a.m. at her former Nationwide agency location," Ms. Forbes's conversion claim

fails as a matter of law. *See* Forbes Deposition, Ex. 4; *Devil's Advocate* at * 25-28 (implied consent or assent makes the taking not wrongful and negates conversion claim). We overrule Ms. Forbes's second assignment of error.

{¶ 41} Having overruled both of Ms. Forbes's assignments of error, we affirm the judgment of the trial court granting summary judgment in Nationwide's favor.

*Judgment affirmed.*

BRUNNER and BEATTY BLUNT, JJ., concur.

_____